Good morning, Your Honors. My name is Jeremiah Idavaya, and I'm counsel for the Plaintiff Appellant Sharon Goldzweig in this employment discrimination case that was brought against Con Edison. The court below granted Con Edison summary judgment, and this is precisely the kind of case that should go to trial. The evidence shows, and a jury could find, that Con Edison was determined to fire Ms. Goldzweig and replace her because of her sex, her age, and her bias complaints. Yet the district court granted summary judgment by turning the applicable standards on their heads. Okay, I'm sorry, so I'm going to ask, a lot of the evidence runs together in this case, but the standards vary because they're not all the same. Some require a but-for, others require something less. Do you think we could rule for you on some of these claims, but not all of them? And if so, why? Your Honor, I believe that there is sufficient evidence under all of the applicable laws. It is, of course, correct that the ADA has a but-for standard, and Title VII has the motivating factor standard. And so the Title VII standard is a lesser standard, and the court could find evidence of gender discrimination without finding the higher standard under the ADA. However, plaintiff maintains that both standards are met here for purposes of the discrimination claims. In addition, Your Honor, there is the city law claim, and the city law claim has an even lesser standard, treated less well. And there is sufficient evidence in this record, certainly to satisfy that lower standard for both age and gender discrimination, as well as the retaliation claims. And one of the arguments that plaintiff has made on appeal is that the district court did not conduct the separate and independent analysis that is required for purposes of the city law claims, including but not limited to the applying the treated less well standard to the discrimination claims, the broad definition of what is protected activity under the city law, and the holdings in the state courts that when there is evidence of pretext, that alone can be sufficient under the city law to get to a jury. So what is the evidence of pretext here? I mean, there are a number of repeated, long-running concerns about your client's performance, communication skills, client interactions, resisting work assignments. There's a number of concerns that are well documented in the record. What's the evidence that those were not the real reason? Yes. Yes, Your Honor. So the documents in this case actually show a largely solid record of performance over nearly 20 years. There is no dispute that in 2015, Ms. Goldschweig did receive a needs improvement rating. It was the most negative rating that she had received at any point in her career. But the other performance evaluations that exist that are in the record are all solid performance, are in some cases positive. The 2015 review that... So how do we, I mean, how do we evaluate that? Do some positive reviews mean that the negative ones were pretext? No, not necessarily, Your Honor. But it is important to look at the specific facts of the case. And here, the one negative review was for plaintiff's work in 2015. She was not fired until January of 2019. So we have multiple performance years after that point in time during which Ms. Goldschweig received positive performance evaluations. In 2016, she received a midyear review that said that she had improved significantly and was on track to satisfy all of her goals and whatever concerns that have been raised in 2015. In her 2017 annual review, which was the last one that Ms. Goldschweig received in March, around March of 2017, there are a number of compliments about her performance. There's not an overall rating because Con Edison changed its rating system at that point. But among other things, the 2017 review says she is committed to ensuring plans comply with laws. She has broad knowledge of her practice areas. She is always accessible to her clients. And she makes herself available to other attorneys. So if she were fired in 2016, closer to the negative review issue, would that mean that it wasn't pretext? I guess I'm not sure I'm following the logic. It's like an inverse temporal proximity sort of reasoning. Your Honor, it depends on what happens and when it happens in this specific case. I mean, in addition to the positive performance evaluations that happened subsequently, it's important to consider that Ms. Goldschweig received incentive compensation for recognizing good performance, both in terms of pay raises after that negative review, as well as bonuses, too. In addition, Your Honor, what's seen in this case... Were they merit-based? Or were they just bonuses that everybody got? No, they were merit-based, Your Honor. And that's in the record. And in fact, in 20, I believe 2017, Ms. Goldschweig's direct supervisor, there's an email to this effect in the record, specifically requested or said that Ms. Goldschweig should receive a merit-based bonus because of her good performance. I will also say that in response to Your Honor's question, that one of the changed circumstances here is that Ms. Goldschweig got a new boss, a new boss that in November of 2018, a new boss who, based on the evidence and testimony a jury could find, had total and utter contempt for Ms. Goldschweig right from the get-go, that he was critical of how she smelled, he was critical about how she dressed. Is that gendered or age-based? I believe that is evidence of gender discrimination, because as the case law recognizes, including this court in the King case, that women are much more likely to be subject to comments about their appearance. And so our contention is that is evidence of gender discrimination. I also want to point out— How? I don't understand that. How is a comment about smell gendered? Because women are much more likely to be the subject of that sort of criticism. This court recently in King looked at comments that were made about a woman's weight and said that those comments could be gender-based, and we believe the circumstances are similar here. In terms of pretext, I also want to make the point for the record that defendants' explanation or description of the key events in this case have shifted over time. In the position statement, defendants maintained that a decision to fire Ms. Goldschweig was made by three individuals, including Mr. D'Angelo. And then during deposition testimony, the testimony was that the decision was not made by Mr. D'Angelo but made several months earlier. And that shifting sequence of events defendants believed helped their case, because by removing Mr. D'Angelo from the equation, they left the decision makers to be folks who were in Ms. Goldschweig's protected categories. But the fact that there is this shifting sequence of events is a basis for a jury to disbelieve the explanations that defendant has given here for firing Ms. Goldschweig. Thank you, counsel. You're reserved two minutes for rebuttal.  Good morning, Your Honors. Thank you. My name is Ephraim Pierre, and I represent the appellee, in this matter. Two 64-year-old women, for whom Ms. Goldschweig does not accuse of discrimination, decided to terminate her employment after years of sub-court performance and clear deficiencies in her essential job duties, which were documented and recognized by successive managers, senior leaders. Were they actually that clear? I mean, the reviews were mixed, right? And when she got the worst of the reviews, you all took no action, right? I think the documentary evidence here, combined with the testimony evidence here, is particularly clear that Ms. Goldschweig struggled in several fundamental duties that she has as an attorney. She had poor communication skills, both oral and written. She was an obstructionist. She resisted orders. Is obstructionist a word that one might use if someone was frustrated that someone made a discrimination claim against you? No, and that phrase is not used within the context of her alleged protected activities or any internal complaints. It was her ability to work cooperatively with other partners internally within Con Edison or even with its outside counsel. Here, the first that I've ever seen in my career, we have an outside counsel approaching its client saying that her encounters with a member of the firm was quite inappropriate. Ms. Goldschweig was then counseled and specifically directed to have no further contact with outside counsel for Con Edison, which is Proskauer here on employee benefit matters. I think that there's nothing more significant than reducing an attorney's ability to use an outside counsel resource. That's the obstructionism that Con Edison was highlighting during Ms. Goldschweig's career. But didn't the company then use that at any point later as a basis for firing? I mean, she wasn't fired after that. No, she wasn't, and I think, Your Honor, I identified that the performance issues happened over a stretch of time, and opposing counsel here stressed that Ms. Goldschweig had not been terminated immediately after that time. And exact reviews indicated improvement in the areas in which there had been detriment. So two things there. First, it was Con Edison's business decision to conduct Ms. Goldschweig's termination in a way that it can ensure a continuity of service, given that she was the only employee benefits attorney that was there. So that's one point. Second point as to the improvement, this is fictitious, and it's proved by the record in of itself. I'll first address the 2017 performance review that was referenced during opposing counsel's testimony. If you go to the record here in A707, it indicates that there are still issues that Ms. Goldschweig still needs to improve. Issues about framing legal issues in a more focused and clear manner. Accepting decisions that are made by the law department. Continuing to present her legal advice in clear memorandum so that individuals within the department can rely on it. These are the same issues that were pervasive in her performance back in 2015, even going farther back in her career. But part of the challenge we have, I mean, it's not clear to me how the timing works for you. Because on one instance, you have these performance reviews in 2015, and you have these complaints. But then, for lack of a better word, Con Edison endured it, and then all of a sudden in 2019, she gets a new boss. It occurs in the context of other conversations, which gendered or not, not professional comments, not comments that you want to have between a supervisor and an employee at best. Why couldn't a reasonable juror conclude that an impermissible reason was one of the reasons why you acted so suddenly in 2019? Right. So, I think one thing to recognize here, Your Honor, is that this wasn't, quote unquote, sudden. This was part of a business decision to restructure aspects of labor and employment group. In late August 2018, September 2018, Ms. Moore and Ms. Taylor wanted to address some deficiencies they identified in this group, first beginning with its leader, Stephen Scotti, by replacing him with one chosen successor, Christopher D'Angelo, and then moving on to Ms. Goldschweig to replace her once continuity of service was established with a secondee. That's in the record with Phyllis Taylor's testimony at 3.05. I think one other thing to identify here is the standard that's applicable. This court clarified its standard under BART for pretextual consideration, for pretext in cases just like this. And the idea here is that the plaintiff must show a tribal issue of fact as to the justification. Here, the justification was subpar performance sustained over a number of years. There's no contrary evidence to that. Even if you go to the idea of merit increases, if you go to the compensation memo that is in the record here, it clearly states that in order to get a merit increase, you must be rated at a 2.5. In the record, in the same email referenced by opposing counsel, Stephen Scotti advocated for Ms. Goldschweig to get the 2.5. She did not receive a 2.5. For the year 2017, she received a 2.36, and then she went further down in 2018 to 2.26. So even if Mr. Scotti held the opinion that she was improving, his email indicates that he thought that she was a hopeless case because he did it if he advocated for this, you know, this level of if she can further improve. And separately, the department categorically said no and rejected his opinion and further reduced any type of merit increase that she was going to be allowed to have. So it's clear that up until the point in time that she was leaving, her superiors, outside counsel, clients were all dissatisfied with her. And as a business decision, Ms. Moore and Ms. Taylor chose to structure their approach as to revamping this department in a reasonable way. And there's no contrary evidence in the record regarding this approach. The best they can do is point to the EEOC position statement submitted long ago in this matter. And putting aside the admissibility issues here, if we focus on the substance of it, all it necessarily says is that as soon as Mr. D'Angelo arrived, it was his responsibility as a direct manager to effectuate the termination. That included securing the secondee, taking whatever necessary steps, and then informing Ms. Goldschweig of that decision. And that's exactly what the EEOC position statement says. Mr. D'Angelo began his employment on November 1, 2018. And mid-November 2018, Con Edison begins its search for a secondee in order to effectuate the termination of Ms. Goldschweig. This happens, if we can briefly touch on retaliation claims, this happens well before any recognized protected activity in this case. So the problem here, again, going back to the issue of pretexts, is you can give a lot of favorable inferences to Ms. Goldschweig. It does happen before, but does that exclude retaliation from being a partial factor? Yes, it does. And I think it's based upon the testimony of Ms. Goldschweig herself. The only retaliatory animus that she can possibly point to, which is in her own declaration in support of summary judgment, is her interaction with Mr. D'Angelo on December 31. She claims that he asked for more detailed information on many pending employee benefits issues, and he was unsatisfied with the answers, and that he yelled at her. That's the best that she can marshal. But if you look at the record here, there are other individuals that yelled at her and expressed frustration. Ms. Moore did. She's not accused of discrimination in this instance. Mr. Levin did as well. He's equally not accused. But putting that aside, the decision had already been made by the time this interaction had occurred. So it could not possibly have influenced Mr. D'Angelo's decision by the time we've gotten to December 31. The problem that Ms. Goldschweig has with the record is that however you slice this timeline, the decision was made long before she could cobble together the weak evidence she has as to discrimination or retaliation. Specifically, I did want to touch on the issue of standards here. I did want to highlight that claims that are brought under the ADEA and the New York State law for purposes of age discrimination have a but-for requirement, which is the highest one this Court has faced here. Underneath that is Title VII for the gender claims, which is a motivating factor test, which again is based upon this Court's decision in BART. And specifically, what I'd like to highlight in BART is to the extent that we feel as though the comments made or allegedly made by Mr. D'Angelo regarding scent, clothing, or the like, we don't have the context for that or even the content of it. Ms. Goldschweig doesn't know. She said under oath, I don't know. But even if that's unsatisfactory, take a look at your cases. In King, there were specific body-shaming comments, comments that the bad actor there told the plaintiff that she needed to watch what she was eating, commenting on the food on her plate, looking at her midsection in disgust, advising her to go to the gym. These are all not there. Even in BART, specifically, the bad actor there called female workers ding-dongs, referred to another female colleague as an idiot, said that the workplace was too stressful for women. Once you compare these cases to the evidence that Ms. Goldschweig here has marshaled, it doesn't meet the standard, and it equally does not meet the standard under the New York City human rights law. I say that my time has expired, but if I could just go back to my standard, particularly with respect to the retaliation claim. Sure. With respect to the retaliation claim, her responsibility there is to ensure that the adverse actions here were caused at least in part by retaliatory motives. Again, the only indication we have of a retaliatory motive here is the interaction between Ms. Goldschweig and Mr. D'Angelo on December 31st. Again, the die was cast. The seconding agreement was already reached in principle. The outreaches to Krosgauer had been conducted months before, and there's no other opportunity for there to be any retaliatory animus because Mr. D'Angelo was out of the office due to the passing of his father, and Ms. Goldschweig had vacation throughout December. So underneath this lower standard, which, by the way, was stated in the lower court's opinion, it just doesn't cross that threshold. At the end of the day, favorable inferences are permissible, but the creation of evidence is a whole other thing, and that's what Ms. Goldschweig is asking for. Speculation, the creation of evidence where none necessarily appears. Thank you, counsel. We'll be right back. Thank you. I did not address the retaliation claim, and I do want to make a special point about it. There's no dispute that the district court found, and there's no dispute in the record, that Ms. Goldschweig engaged in protected activity. The district court were taking the position, erred in limiting or narrowing that protected activity, but nevertheless, defendant has conceded, and the district court found that Ms. Goldschweig made a protected complaint to one of the supervisors within the labor and employment group, Mr. Levin, and she did so several weeks before she was told that she was being fired. As to defendant's position that a firing decision had already been made, as of the time that Ms. Goldschweig engaged in protected activity, there's not a single shred of paper that shows that. Con Edison is a sophisticated, a big company. It's certainly, a jury could find it curious and have questions as to why there was no paper trail, and if you take that in conjunction with defendant's shifting explanation for who made the decision and when the decision was made, that is enough for a jury to be able to consider this case. The first piece of evidence of any intention to fire Ms. Goldschweig was December 21st, and the talking points for firing her were on January 2nd, and there is no doubt in the record that Ms. Goldschweig had made protected complaints before that had taken place. I don't have anything else, Your Honor, unless there's other questions. Thank you, counsel. Thank you both. We'll take the case under caution.